FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2007 JUN 12 PM 12: 34

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. **07-CV-01228**-LTB-MEH

LARRY W. MCCORMACK,

    Plaintiff,

v.

PRORODEO HALL OF FAME AND MUSEUM OF THE AMERICAN COWBOY, INC.

PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC.

TROY L. ELLERMAN

TANNA KIMBLE

CARA TURNER

RYER HITCHCOCK

PROFILE EMPLOYEE ASSISTANT PROGRAM

STEVE TUCKER, PhD.

DOES I THROUGH V, INCLUSIVELY.

    Defendants.

---

## COMPLAINT

---

COMES NOW, Plaintiff, Larry McCormack, In propria persona, and for his Complaint

1

Dockets.Justia.com

against the Defendants states as follows:

## I. PARTIES

1.    Plaintiff, Larry McCormack, is a resident of Colorado Springs, Colorado, and a former

employee of the Professional Rodeo Cowboys Association ("PRCA") and the Pro Rodeo

Hall of Fame and Museum of the American Cowboy ("HOF"). He resides at 6387

Mesedge Drive, Colorado Springs, CO 80919

2.    The Professional Rodeo Cowboys Association, Inc. (PRCA) is a corporation authorized

to do business in the State of Colorado and is headquartered at 101 Pro Rodeo Drive,

Colorado Springs, CO 80919.

3.    The ProRodeo Hall of Fame and Museum of the American Cowboy, Inc. (HOF) is a

corporation authorized to do business in the State of Colorado and is headquartered at

101 Pro Rodeo Drive, Colorado Springs, CO 80919.

4.    Troy Ellerman is a resident of Woodland Park, CO and was commissioner of the PRCA

and President of the Board of the HOF. He resides at 350 Black Bear Trail, Woodland

Park, CO 80863

5.    Tanna Kimble is a resident of Divide, CO and an employee of the HOF. Her address is

251 County Road 25, Divide, CO 80814

6.    Cara Turner is a resident of Colorado Springs, CO and an employee of the HOF. Her

current address is presently unknown to plaintiff.

7.    Profile Employee Assistance Program/Total Healthcare, Inc is a corporation authorized to

do business in the State of Colorado. Corporate offices are at 1633 Medical Center Point,

#253 Colorado Springs, CO 80907

8.      Steve Tucker is a resident of Monument, CO and an employee of Profile Employee

Assistance Program/Total Healthcare, Inc.

## II. JURISDICTION

9.      Jurisdiction is asserted pursuant to the following statutory authorities: 18 U.S.C. § 2520,

28 U.S.C. § 1343, and 28 U.S.C. § 1367.

## III. VENUE

10.     All of the events giving rise to the complaint occurred in Colorado.

## IV. GENERAL ALLEGATIONS

11.     Prior to moving to Colorado Springs and accepting employment with the PRCA, and

later, the HOF, McCormack worked as private investigator in the Sacramento, California

area.

12.     Prior to moving to Colorado Springs and accepting employment with the PRCA and the

HOF, Ellerman worked as an attorney in Sacramento, California.

13.     From 1998 until March 2005, McCormack had a working relationship with Ellerman as

his contracted investigator, paralegal, and expert witness. The two shared an office in

various locations in Sacramento for about six years.

*McCormack's Hiring by the PRCA*

14.     In December, 2004, Ellerman informed McCormack that he, Ellerman, had been offered

3

the position of Commissioner of the PRCA. During that conversation, Ellerman asked McCormack to help him "run the PRCA," and offered to pay McCormack $140,000/year.

15.    In February, 2005, McCormack and his wife flew to Colorado Springs to discuss the job offer with the PRCA and look for housing.

16.    After the February, 2005 meeting Ellerman offered McCormack the PRCA Human Resources director job at a $90,000/year salary. Ellerman told McCormack that the salary will be increased to the promised $140,000/year after "things at the PRCA are sorted out." Ellerman assured McCormack that McCormack would have employment with the PRCA for as long as Ellerman was Commissioner and that he would be paid $140,000/year.

17.    In order to accept employment with the PRCA, McCormack gave up a successful business in California and moved to Colorado Springs.

18.    On March 25, 2005 McCormack started his employment with the PRCA as the Human Resources director.

19.    In mid-April, 2005, Ellerman promoted McCormack to the position of PRCA Chief Operating Officer and raised his salary to $100,000/year.

20.    In May, 2005, McCormack sold his house in California, bought a house in Colorado Springs, and moved his family to Colorado Springs.

21.    Around the time McCormack purchased his house in Colorado Springs, Ellerman repeatedly assured him that he would have continued employment with PRCA, which assurance McCormack relied upon in giving up a successful business, selling his new

4

home, and moving his family from California.

22. In reliance on Ellerman's promises of long-term employment and a salary of $140,000/year for McCormack, McCormack's wife gave up her $95,000/year job in California upon the move to Colorado Springs.

23. Ellerman should have reasonably expected McCormack to consider the promise to him a salary of $140,000/year a commitment that McCormack would rely on, and that justice requires be enforced.

24. McCormack did in fact rely on Ellerman's promise that he would be paid $140,000/year to work for the PRCA.

25. McCormack substantially performed his side of the bargain.

26. Contrary to Ellerman's promise, McCormack was never compensated at the rate of $140,000/year.

27. The PRCA breached the promise to pay McCormack wages of $140,000/year.

*McCormack's Hiring by the HOF*

28. In June, 2005, Greg Rieber, the Executive Director of the HOF resigned his employment.

29. After Rieber's resignation, Ellerman asked McCormack to take over as the Executive Director of the HOF.

30. Ellerman explained that McCormack would have control of, and be able to run the HOF as he saw fit, as it is a separate entity from the PRCA. Despite that assurance from Ellerman, McCormack still felt that his employment security was dependent upon Ellerman.

31.    On July 7, 2005, McCormack started working as the Executive Director of the HOF.

*The Proposed Move to New Mexico*

32.    On February 6, 2006, Ellerman held a meeting of the department heads of the PRCA during which he announced that the PRCA Board of Directors would vote the following day on a proposal to move the PRCA and the HOF to New Mexico.

33.    Ellerman purposely excluded McCormack from the February 7, 2006 PRCA Board of Directors meeting.

34.    On February 7, 2006, the PRCA Board of Directors met and voted unanimously to move the PRCA and the HOF to New Mexico.

35.    Ellerman later explained to McCormack that he had been excluded from the meeting because Ellerman knew he would be opposed to the proposed move to New Mexico and would have voiced that opposition to the PRCA Board of Directors during the meeting.

36.    The vote to move to New Mexico occurred without the members of the Board being apprised of all the information regarding the proposed move to New Mexico, including a letter written by McCormack to the PRCA Board about the disadvantages of the proposed move (attached as Exhibit "A").

37.    Two members of the PRCA board, Cotton Rosser and Kelly Wardell, told McCormack that the reason they voted for the move was the money promised by New Mexico, but had they seen his letter, they probably would not have supported the move.

*The HOF Bylaws– Board of Trustees*

38.    After learning of the PRCA board's vote to move the HOF to Albuquerque, McCormack,

6

who was still opposed to the move, reviewed the HOF bylaws (attached as Exhibit "B").

39.    The HOF bylaws state that "The principal office of the corporation in the State of Colorado shall be located in the City of Colorado Springs, County of El Paso, unless otherwise determined by the Board of Trustees from time to time."

40.    McCormack interpreted the HOF bylaws as requiring a vote of the HOF Board to move the HOF from Colorado Springs.  Based on that interpretation, McCormack determined that the vote of the PRCA Board to move the HOF had no legal effect on the HOF.  He informed Ellerman and Tom Feller, the PRCA Board Chairman, of his opinion.

41.    McCormack also informed Ellerman and Feller that the PRCA owned only eleven percent of the property where the HOF and PRCA headquarters are located, and that the PRCA could not benefit from the HOF portion of proceeds from a sale of the property since the HOF is a 501(c)(3) corporation and the PRCA is a 501(c)(6) corporation and the portion of the proceeds of the sale belonging to the HOF must stay with the HOF or go to another 501(c)(3) corporation.

42.    After learning that the PRCA did not have what he felt to be significant control over the HOF property, Feller told McCormack during a three-way telephone conversation with McCormack, Ellerman, and himself, that he would find a way to change that situation.

43.    During McCormack's review of the bylaws of the HOF he determined that the composition of the Board of Trustees, its meeting schedule, and its performance of required duties did not meet the mandates of the bylaws.

7

44.  The HOF bylaws require that the Board of Trustees be comprised of fifteen trustees.  The Commissioner and Director of Rodeo Administration of the PRCA, as well as six PRCA members are referred to as "Inside Trustees."  The eight Inside Trustees elect seven "Independent Trustees."

45.  The HOF bylaws designate the Executive Director as an ex-officio, non-voting member of the HOF Board of Trustees.

46.  In February, 2006, the HOF Board of Trustees was not comprised of the proper number of members.

47.  With the understanding that members of the HOF board of trustees were the only ones who could decide to move the HOF, McCormack started taking steps to put a complete board in place.  This was not only to prevent the move to New Mexico, but because McCormack was concerned that by operating without a proper board of trustees in place, the HOF was not in compliance with state and federal law regarding the management, and tax-exempt status of, non profit corporations.

48.  By May 15, 2006, McCormack had assembled a new board of trustees for the HOF.  At the board's first meeting on May 15, 2006, the board took official action and voted unanimously to appoint McCormack as the HOF Executive Director in accordance with the HOF bylaws.

49.  The HOF board then voted unanimously to turn down New Mexico's offer to move the HOF.  The following day, the PRCA board voted unanimously to reject the New Mexico

move proposal as well.

50.   After the rejection of the proposal to move the HOF to New Mexico, the relationship between McCormack and Ellerman soured.  Ellerman became increasingly confrontational toward McCormack.

*The HOF Bylaws-- Employment of the Executive Director*

51.   The HOF bylaws state that the "day-to-day operations and management" of the HOF shall be carried out by the Executive Director, "subject to the direction and supervision of the Board of Trustees, its Executive Committee, and the President." Ellerman, by virtue of his position as Commissioner of the PRCA, was also the President of the HOF.

52.   The HOF bylaws require input from the Executive Committee before the HOF Executive Director's employment could be terminated.  The bylaws, Article IV, Para. 10.  <u>Executive Director</u> reads as follows:

The Executive Director shall be hired and retained by the Board of Trustees with the input of the Executive Committee.  The President shall have supervisory authority over the Executive Director but shall have no authority to hire or discharge the Executive Director.

53.   Pursuant to the language of Article IV, Para. 10 of the HOF bylaws the Executive Director cannot be terminated by the President of the Board, nor can the Executive Director be terminated by the Board of Trustees without first receiving input from the

9

Executive Committee.

54.    The HOF bylaws do not disclaim any contractual intent.

55.    The HOF Board of Trustees should have reasonably expected McCormack to consider the language of Article IV, Para. 10 of the HOF bylaws a promise that his employment could not be terminated by the Board of Trustees without first receiving input from the Executive Committee a commitment that McCormack would rely on, and that justice require be enforced.

56.    By continuing his employment, McCormack reasonably relied, to his detriment on the language of the bylaws as a promise that his employment could not be terminated without input from the Executive Committee to the HOF Board of Trustees.

*The HOF Bylaws– The Executive Committee*

57.    Article V, Para. 1 of the HOF Bylaws states that

There shall be an Executive Committee of the Board of Trustees appointed from among the members of the Board of Trustees which shall have and exercise the authority of the Board of Trustees in the management of the corporation in between the meetings of the Board of Trustees, except that the Executive Committee shall not have the authority of the Board of Trustees to amend, alter or repeal the Bylaws; to elect, appoint or remove any member of the Executive Committee or any Trustee or the

10

President or Executive Director of the corporation . . . .

Article V, Para. 2 of the HOF Bylaws prescribes the composition

of the Executive Committee, Committee which states:

> shall consist of five (5) voting Trustee members. The President of
> the corporation shall automatically serve as a member of the
> Executive Committee by virtue of his office with the corporation.
> The four other voting members of the Executive Committee shall
> consist of two Trustees each from among the Inside Trustees and
> Independent Trustees of the Board of Trustees. The Executive
> Director shall be an ex-officio, nonvoting member of the Executive
> Committee.

*McCormack's Work as Executive Director*

58.   In the latter part of May and early part of June, 2006, McCormack traveled throughout

the southeast United States attending various events to promote the HOF.

59.   On June 12, 2006, McCormack and an HOF contractor, Pete Relyea, drove non-stop from

Nashville, TN to the HOF in Colorado Springs in order for McCormack to be at work on

the morning of June 13, 2006.

60.   On the afternoon of June 13, 2006, Ellerman and Kirk Skabo, the PRCA controller, met

with McCormack in his office to discuss the HOF budget. Ellerman informed

McCormack that the HOF was over budget, and that its budget was out of line with the

other departments within the PRCA. Whenever McCormack tried to explain issues

regarding the HOF budget, Ellerman would cut him off and not allow him to speak.

After berating McCormack about the budget, Ellerman stormed out of McCormack's

office.

61.   McCormack and Skabo continued to discuss the budget in McCormack's office after
      Ellerman had stormed out. Skabo informed McCormack that prior to the meeting,
      Ellerman told him that he knew that the budget discussion would make McCormack
      angry.

62.   At about 6:00 p.m. on June 13, 2006, McCormack stopped by Ellerman's office to
      continue discussing the budget.  It again became a heated discussion. Ellerman was
      hostile and condescending toward McCormack.  Ellerman became angry with
      McCormack, told him that he had a "shitty" attitude, and went into a tirade at
      McCormack, refusing to let him interject or answer.

63.   As the conversation in Ellerman's office became more confrontational, Ellerman picked
      up a binder and slammed it on his desk while cursing at McCormack.  Ellerman's actions
      caused McCormack to get up, back away from the desk, and move away from Ellerman.
      Ellerman then got up to leave the office. Ellerman walked past McCormack in a
      physically threatening manner.  Ellerman walked extremely close to McCormack and
      glared at him menacingly. McCormack had never seen Ellerman act this way toward him
      during their entire relationship in Sacramento or while they worked together at the
      PRCA/HOF.

64.   Ellerman's actions and threatening manner placed McCormack in apprehension for his
      physical safety and made him fearful of imminent bodily harm.

12

65. In order to avoid Ellerman, McCormack left the building from a different direction than Ellerman.

66. Later that evening, Ellerman called McCormack at home to apologize for his behavior earlier in the day.

67. Within days after the June 13, 2006 meeting in Ellerman's office, McCormack recounted the confrontation in a telephone call to a friend. During the call, McCormack jokingly said that although Ellerman may be younger and stronger, if he would have come any closer or tried anything physical, McCormack would have hit him with a ceremonial shovel Ellerman kept in his office. The call was made from McCormack's office, with no one else present in the office, and at a volume that could not be heard by others outside McCormack's office.

68. On June 20, 2006, two HOF employees, Tanna Kimble and Cara Turner met with Ellerman to discuss allegations that McCormack was creating a hostile work environment through language he had used during telephone calls, and to inform Ellerman that McCormack had threatened to hit him with a shovel.

69. The next day, McCormack and Ellerman met to discuss Kimble and Turner's allegations. During that meeting, Ellerman told McCormack that the PRCA's employment law attorney, Glenn Schlabs, recommended that McCormack be evaluated by an EAP counselor to see if he is a threat to himself or anyone else, and to get a release to return to work.

13

70.   That same day, McCormack voluntarily met with the EAP counselor, Dr. Steve Tucker,
      of Profile Employee Assistance Program and explained the events that had occurred in
      Ellerman's office on June 13, 2006, as well as other aspects of McCormack's relationship
      with Ellerman. McCormack specifically asked Tucker if their discussion was private and
      confidential. Tucker assured McCormack that anything they discuss in an EAP session
      would be kept completely confidential. EAP brochures from Tucker's office assured that
      all discussions would be private unless otherwise dictated by written release from the
      employee.

71.   Dr. Tucker completed a fitness for duty release for McCormack, and released him to
      return to work, finding that McCormack did not pose a threat to himself or anyone else.
      After hearing McCormack's assessment of the issues, Tucker asked McCormack, "how
      do you work for someone like that?" Tucker was referring to Ellerman in the statement.

72.   After receiving the release from Dr. Tucker, McCormack brought it directly to Ellerman
      who was in his office.  While in Ellerman's office, in front of Aaron Inget, a PRCA
      employee, Ellerman asked McCormack "Well, are you crazy?"

73.   Ellerman then began discussing the release to work and other matters related to
      McCormack's consultation with the EAP doctor, including facts of the consultation in
      Inget's presence, before deciding that Inget should leave because of confidentiality
      issues.

74.   Upon information and belief, Ellerman disclosed facts regarding McCormack's

14

consultation with the EAP therapist to Aaron Inget and others.

75.    Prior to Ellerman's disclosure of the facts regarding McCormack's consultation with the EAP therapist, those facts were private between McCormack and the EAP therapist and, according to Profile EAP's own "Laws of Confidentiality" brochure, should not have been released without McCormack's written consent to the therapist to do so (see Exhibit "C").

76.    At the time of his disclosure of those facts, Ellerman knew, or should have known, that the facts of McCormack's consultation with the EAP therapist which he disclosed to others were private.

77.    McCormack was seriously upset and embarassed by Ellerman's disclosure of the facts of McCormack's consultation with the EAP therapist.

78.    At 3:00 a.m. on June 22, 2006, McCormack awoke thinking that members of the HOF staff were secretly bugging or recording him while he was in his office.

79.    When McCormack arrived at his office on the morning of June 22, 2006, he was unable to locate his digital recorder, which he had not seen since loaning it to assistant HOF director Tanna Kimble earlier in the month.

80.    When Kimble arrived at work, McCormack asked her to return the digital recorder. Kimble became nervous and told McCormack that she no longer had his recorder, and that she'd given it to HOF membership coordinator Cara Turner.

81.    McCormack then asked Kimble to get the recorder back from Turner. Kimble told

McCormack that she could not get the recorder back from Turner, as Turner had given it to Ellerman. McCormack asked her why Ellerman would have the recorder. Kimble told McCormack he would have to talk to Ellerman about it.

82.   McCormack then went to Ellerman's office where he saw his digital recorder on Ellerman's desk, and picked it up.

83.   Ellerman told McCormack to sit down, and began to chastise McCormack about things he had heard McCormack say when he listened to the recordings.

84.   McCormack told Ellerman that the recordings were made illegally and that such actions constitute a Class 6 felony in Colorado.  McCormack then stated that he should report the matter to law enforcement and hire a lawyer to address the issue.

85.   Ellerman told McCormack that he would be fired if he "lawyered up," and that if the HOF board found out, they would dismiss McCormack.  Ellerman used his authority to bully McCormack into agreeing to remain silent and not report the surreptitious recordings.

86.   After he left Ellerman's office, McCormack reviewed the recordings on his digital recorder.  McCormack discovered recordings of at least three separate private conversations between himself and other parties.

87.   Neither McCormack nor any of the other parties to each of the recorded conversations were aware that the conversation was being recorded.

88.   Neither McCormack nor any of the other parties to each of the secretly recorded

conversations consented to the recording of the conversations.

89. McCormack had a reasonable expectation of privacy in each of the conversations that were secretly recorded.

90. Upon information and belief, the conversations were secretly recorded by Tanna Kimble and/or Cara Turner.

91. Upon information and belief, Ellerman was aware of, and approved of, the secret recordings.

92. Upon information and belief, Ellerman, Kimble and Turner agreed, by words or conduct, to secretly record McCormack's conversations.

93. Kimble and/or Turner used McCormack's digital recorder to secretly record his conversations.

94. Kimble and/or Turner intentionally invaded McCormack's privacy by secretly tape recording his conversations.

95. Kimble and/or Turner intentionally used and disclosed the contents of the recorded conversations and intentionally disclosed the contents of those conversations to Ellerman and others.

96. Ellerman intentionally used the contents of the recorded conversations and intentionally disclosed the contents of those conversations to others.

97. On June 24, 2006, McCormack attended a Pikes Peak Range Riders function with some of the employees and board members of the PRCA and HOF. At the event, McCormack

informed Hal Littrell and Ryer Hitchcock, two HOF board members, of his discovery of the secret recording of his conversations by HOF employees.

98.    Hitchcock and Littrell told McCormack not to discuss the secret recording with anyone.

99.    On June 30, 2006, Hitchcock, Littrell and David Palanchar, another HOF board member, had a meeting with Ellerman.  McCormack was not invited to the meeting.

100.    After that meeting, Ellerman told McCormack that he had formed a "special committee" for the HOF consisting of Hitchcock, Littrell, Palanchar, and three other HOF board members, Keith Martin, Dale Knobbs, and Harry Vold.

101.    On June 30, 2006, Dr. Tucker interviewed all of the members of McCormack's staff and discussed confidential matters about McCormack's EAP consultations without a written release from McCormack to do so.

102.    Dr. Tucker then proposed a plan to Ellerman, which Ellerman memorialized in a letter to McCormack dated July 5, 2006.  The language of the plan, as stated in the letter from Ellerman to McCormack reads as follows:

1.    You [McCormack] and I [Ellerman] will meet once a week for two months to review your performance.  I will elicit feedback from your staff and from you on the progress you are making.

2.    At the end of this two month period, assuming things are going well; we will meet once every other week for the rest of the year.

3.    You will contact the Center for Creative Leadership (or similar organization) and make arrangements to attend a course there before the end of August.  This course should be designed to help you build leadership, coaching and team development skills.

18

4.    You will contact Dr. Tucker today and schedule follow up appointments with him to address anger management, accountability, decision-making, and alcohol related issues.

5.    Six months from now, in January of 2007, I will conduct a management review of your performance at the Hall of Fame, which will reflect the results of your efforts and determine our course of action going forward.

The July 5, 2006 letter containing the plan set forth above was signed by Ellerman, and contained a line for McCormack to sign if he "AGREED AND ACCEPTED" the terms of the plan.

103.    McCormack signed the letter on July 6, 2006.  By signing the letter, McCormack signified his agreement with the plan and his acceptance of the terms.

104.    The plan contained a promise that McCormack's performance would be reviewed in "January of 2007."

105.    McCormack reasonably interpreted that promise as a promise of continued employment from July 6, 2006 through at least January, 2007.

106.    By continuing employment, McCormack reasonably relied on that promise of continued employment to his detriment.

107.    On July 18, 2006, McCormack and Ellerman had one of their weekly

19

meetings as set out in Dr. Tucker's plan.

108.  During that meeting, Ellerman repeatedly discussed matters of a personal nature about McCormack, including EAP matters and the details of McCormack's consultations with Dr. Tucker in front of Carol Boyles, a PRCA employee, who was in the office taking notes.

109.  Later in the day on July 18, 2006, while McCormack was in his office with Peter Relyea, he received a call from Dr. Tucker. McCormack told Relyea that the call was confidential, and asked Relyea to leave the office. Relyea left the office closing the door behind him.

110.  As Relyea left the office, Kimble approached, looking for McCormack. Relyea told her that McCormack was on a confidential telephone call and he then walked to the rest room.

111.  When Relyea exited the rest room and was walking toward McCormack's office, he witnessed Kimble bent over with her ear pressed against McCormack's door, apparently listening to his conversation.

112.  Relyea informed McCormack that he had seen Kimble attempting to listen to McCormack's conversation through his office door.

113.  In a conversation with McCormack on August 1, 2006, Kimble admitted that she had been listening to his conversation through the door.

114.  Kimble intentionally invaded McCormack's privacy by eavesdropping through a closed

door on a conversation she knew McCormack intended to keep confidential.

115.    On August 7, 2006, the special committee of the HOF board met.  During that meeting Ryer Hitchcock aggressively attacked McCormack regarding the HOF's monetary losses. When McCormack attempted to explain things in his defense, Hitchcock called an executive session to force McCormack out of the meeting.

116.    On August 14, 2006, McCormack received a letter from the special committee outlining their expectations of him and including specific duties they wanted him to perform.

117.    The letter included time frames for the performance of those duties and included a requirement that he give a progress report at the October, 2006 board meeting.

118.    Although it was clear to McCormack that the special committee questioned his abilities as the HOF Executive Director, he recognized the inclusion in the letter of the specific time frames for the performance of required duties as a commitment to him to continue his employment until those tasks had been completed. McCormack began taking steps necessary to comply with all the directives in the letter.

119.    It was reasonable for McCormack to rely on the representations of continued employment in the August 14, 2006 letter, as those representations were consistent with the promise of employment through January, 2007 in the July 5, 2006 letter from Ellerman.

120.    Late in the day on August 14, 2006, McCormack sent an email to Ellerman informing him that the "special committee" was not authorized by the HOF bylaws, and that changes to its composition were required for it to be in compliance with the bylaws.

Ellerman read McCormack's email, but did not respond.

121.  On August 24, 2006, McCormack sent a letter to the HOF board informing them that the
      Special Committee was not formed in compliance with the HOF bylaws, and
      recommended that the composition of the committee be changed to comply with the
      bylaws (see attached Exhibit "D").

122.  Although the bylaws of the HOF allow for the formation of committees, the special
      committee was exercising authority in excess of that allowed by the HOF's bylaws.

123.  Under the Colorado Revised Nonprofit Corporation Act (CRNCA), § 7-121-101 *et seq.*,
      officers of a non-profit corporation are required to carry out their duties in accordance
      with the corporation's bylaws.  C.R.S. § 7-128-302.

124.  In exercising authority not granted to them by the HOF's bylaws, the members of the
      special committee were not carrying out their duties in accordance with the HOF's
      bylaws.

125.  Throughout his employment with the PRCA and the HOF, McCormack sought to have
      the members of the organizations respective boards comply with their legal duties to the
      corporations.

126.  On August 29, 2006, Ellerman informed McCormack that Ryer Hitchcock had set a
      board meeting for the following day, and that Hitchcock was "leading a charge" to get
      McCormack fired.

127.  On August 30, 2006, the board of the HOF met, and voted to terminate McCormack's

employment with the HOF. According to a conversation Ellerman later had with McCormack, the vote was eight to seven in favor of termination of McCormack's futher employment.

128. In retaliation for McCormack's objection to Hitchcock's usurpation of power in forming a committee that operated outside the HOF's bylaws, and his disclosure of that problem to the HOF board, Hitchcock caused the board to discharge McCormack.

129. The HOF discharged McCormack in violation of public policy by terminating him for objecting to the illegally formed special committee and disclosing his objections to the board.

130. Using the board solely for personal retribution, Hitchcock caused the board to discharge McCormack in retaliation for his foregoing acts. He did so maliciously, willfully and wantonly, and in reckless disregard of McCormack's rights, solely for his own personal interests, and without any intent to serve any legitimate purposes of the HOF.

131. As a result of Defendants' actions or omissions, McCormack has suffered past, and will suffer future, pecuniary harm and emotional distress, severe emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, damage to his reputation, and other non-pecuniary losses.

132. The purpose of defendants' conduct described above was to obtain, use and disclose information about the plaintiff for the purpose of harming him financially, reputationally, and emotionally. Defendants' conduct was willful and wanton, malicious and oppressive.

23

### FIRST CAUSE OF ACTION– ECPA

133.    Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

134.    Upon information and belief, defendants intentionally intercepted, by obtaining the contents of, wire or oral communications to which the plaintiff was a party, by means of an electronic, mechanical or other device, in violation of the Electronic Communications Privacy Act (ECPA), 18 United States Code § 2511(1) (a).

135.    Upon information and belief, defendants intentionally disclosed and/or used the contents of the aforementioned intercepted wire or oral communications knowing or having reason to know that the communications were obtained through an interception of a wire or oral communication in violation of the ECPA, 18 United States Code § 2511(1), which conduct was a violation of 18 United States Code § 2511(1) (b), (c) & (d).

136.    Upon information and belief, defendants intentionally endeavored to intercept, or procured others to intercept or endeavor to intercept, a wire or oral communication in violation of 18 United States Code § 2511(1)(a).

## SECOND CAUSE OF ACTION - BREACH OF CONTRACT/PROMISSORY ESTOPPEL

137.    Plaintiff realleges all prior paragraphs and incorporates them herein.

138.    Defendant breached a contract with Plaintiff by terminating his employment prior to January, 2007.

139.    Plaintiff is entitled to relief pursuant to the doctrine of promissory estoppel as a result of having been terminated prior to January, 2007.

140.   Defendant's breach of the promises entitles Plaintiff to relief under principles of contract and promissory estoppel law.

### THIRD CAUSE OF ACTION– INVASION OF PRIVACY

141.   Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

142.   Defendants' intentional wiretapping, electronic eavesdropping on conversations, and reporting private facts about the plaintiff without his consent, written or otherwise, constituted intrusions and disclosures of private facts which were highly offensive to a reasonable person which caused him damages as described above.

143.   Profile EAP Counselor Steve Tucker disclosed private facts to McCormack's supervisor and subordinates without McCormack's consent, written or otherwise, causing him embarrassment and humiliation which was highly offensive to a reasonable person which caused damage to his reputation with his superiors, peers, and subordinates.

### FOURTH CAUSE OF ACTION– CIVIL CONSPIRACY

144.   Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

145.   Defendants' agreed to accomplish illegal purposes and legal purposes through illegal means; specifically, the secret bugging and recording of McCormack's private conversations.

146.   One or more acts were performed to accomplish the unlawful purpose, and one or more unlawful acts were performed to carry out the lawful goal, of the conspiracy.

147.   Lawful and unlawful acts performed in the course of the conspiracy caused damages to

plaintiff as set forth above.

## FIFTH CAUSE OF ACTION– WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

148.  Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

149.  The exercise of authority by the special committee in excess of that granted by the bylaws of the HOF violated the mandates of public policy.

150.  Plaintiff's objections to these violations of clear mandates of public policy were related to his basic responsibility as a citizen and his right, duty or privilege as an employee of, and Executive Director of, the HOF.

151.  Plaintiff had a duty, right, and privilege to protest and cause the disclosure of those violations of public policy without fear of retaliation.

152.  By discharging Plaintiff for such conduct, the HOF compromised and undermined the efficacy and implementation of those public policies by chilling reasonable employees from reporting violations of those laws to boards of directors in the future.

153.  By terminating him for causing disclosure of this information to the board, the HOF forced plaintiff to choose between fulfilling that duty at the risk of dismissal or disregarding that duty and be fired.

154.  At the time of his protests and disclosures, Plaintiff had a reasonable belief that the special committee's usurpation of authority and failure to disclose it to the board were violations of those laws.

## SIXTH CAUSE OF ACTION– INTENTIONAL INTERFERENCE WITH ECONOMIC

26

**RELATIONS**

155.  Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

156.  Hitchcock was aware of the agreement between the HOF and Plaintiff.

157.  Hitchcock intended that the agreement be breached, and that Plaintiff's employment be
      terminated, whether or not it caused the HOF to breach the Agreement.

158.  Hitchcock induced the HOF to breach the agreement and to terminate Plaintiff's
      employment.

159.  Hitchcock's inducement was motivated solely by a desire to harm Plaintiff.

160.  Hitchcock's inducement of Plaintiff's termination was outside the scope of his official
      duties as an officer and director, and was willful and wanton.

**SEVENTH CAUSE OF ACTION– BREACH OF THE IMPLIED COVENANT OF GOOD
FAITH AND FAIR DEALING**

161.  Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

162.  The HOF's acts and omissions breached its duty to Plaintiff to deal with him fairly and in
      good faith.

**EIGHTH CAUSE OF ACTION– ASSAULT**

163.  Plaintiff incorporates all prior and subsequent paragraphs in this complaint.

164.  Ellerman intended to place McCormack in fear of an imminent bodily harm.

165.  Ellerman placed McCormack in apprehension of immediate physical contact.

**RELIEF REQUESTED**

Based on the foregoing, Plaintiff requests the following relief pursuant to 18 U.S.C. §

27

2520 (b) & (c), and state common law:

1.    Injunctive relief prohibiting defendants from continuing to engage in the behavior described above and to violate plaintiff's rights as set forth above;

2.    Actual damages suffered by plaintiff;

3.    Statutory damages;

4.    Punitive damages;

5.    Reasonable attorney's fees and litigation costs reasonably incurred;

6.    Nominal damages;

7.    Pre- and post-judgment interest at the highest rate; and

8.    All other legal or equitable relief the court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable to a jury.

Respectfully submitted this 12th day of June, 2007.

LARRY W. McCORMACK
Plaintiff In Propria Persona
6387 Mesedge Drive
Colorado Springs, CO 80919
(719) 302-6200 Cell (719) 440-7850