FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2007 SEP 27   AM 10: 44

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 07-cv-01228-LTB-KLM

LARRY W. MCCORMACK,

      Plaintiff,

v.

PRORODEO HALL OF FAME AND MUSEUM OF THE AMERICAN COWBOY, INC.

PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC.

TROY L. ELLERMAN

TANNA KIMBLE

CARA TURNER

RYER HITCHCOCK

PROFILE EMPLOYEE ASSISTANCE PROGRAM//TOTAL HEALTHCARE, INC.

STEVE TUCKER, PhD.

DOES I THROUGH V, INCLUSIVELY.

      Defendants.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' PRORODEO HALL OF FAME AND MUSEUM OF THE AMERICAN COWBOY, INC., PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC., TANNA KIMBLE, AND RYER HITCHCOCK MOTION TO DISMISS PURSUANT TO FED. R. CIV. P 12(B)(6)

---

1

Dockets.Justia.com

Plaintiff Larry W. McCormack, acting in propria persona, in support of his RESPONSE IN OPPOSITION TO DEFENDANTS' PRORODEO HALL OF FAME AND MUSEUM OF THE AMERICAN COWBOY, INC., PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC., TANNA KIMBLE, AND RYER HITCHCOCK  MOTION TO DISMISS PURSUANT TO FED. R. CIV. P 12(B)(6), states for the reasons set forth below that Plaintiff's claim should not be dismissed:

## I. PLAINTIFF'S RESPONSE TO DEFENDANTS' PRESENTATION OF MATTERS OUTSIDE THE PLEADING PURSUANT TO FED. R. CIV. P. 12(B)(6)

In Defendants' introduction to the Motion to Dismiss at 1, ¶¶ 1,  Defendants have referred to information stating "the individuals with whom he worked *repeatedly* expressed concern about his anger management, decision making, and use of alcohol." Again, on page 3, Defendants state, "In the months leading up to his termination, Plaintiff's colleagues and employers became increasingly concerned both with his ability to be fiscally responsible and with his "anger management, accountability, decision-making, and alcohol related issues." While some of these issues are referred to in a confidential letter between Plaintiff's supervisor, Troy Ellerman, and Plaintiff, there is nothing in the pleadings, short of one incident that discusses certain defendants reporting a telephone conversation they overheard (Compl. ¶¶68), that refers to any of these issues being a concern of the "individuals with whom he worked," or with his "colleagues and employer (employer referring to the Hall of Fame Trustees)." Nor does the Complaint allege that Plaintiff's co-workers "*repeatedly* expressed concern about his anger management, decision making, and use of alcohol." From the language contained in the Motion

2

to Dismiss, it appears that the Defendants are relying on extrinsic statements from the "individuals with whom he worked" and his "colleagues and employer" in order to state their case in filing this Motion to Dismiss.

In the next sentence of page 1, ¶¶ 1 of the Motion to Dismiss, Defendants state, "As a result of continued substandard performance and financial mismanagement, Plaintiff's employment was terminated in August, 2006." The pleading contains no facts that can be construed as a legitimate cause for Plaintiff's termination. In fact, Plaintiff was never given any actual or constructive cause for his termination until he was presented the allegations contained in the Defendant's Motion to Dismiss. Therefore, the "cause" for Plaintiff's termination obviously came from another extrinsic source outside the pleading.

On page 3, ¶¶ 4, Defendants state, "First, as alleged by Plaintiff, his co-workers taped some of his office calls using a hand held digital recorder in order to support 'allegations that [he] was creating a hostile work environment through language he had used during telephone calls'." There is no information contained in the pleadings that explains any reasons for the "co-workers" to have tape recorded Plaintiff's telephone calls. Therefore, Defendants are again relying on extrinsic statements to establish facts in support of their Motion to Dismiss. Furthermore, to establish creation of a hostile work environment, plaintiff "must prove that the harassment was severe and pervasive enough to alter her terms and conditions of employment; hence, it was axiomatic that a 'hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice'" see *R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 2070, 153 L.Ed. 2d 106 (2002). Plaintiff finds it

3

difficult to imagine that the Court would determine that one illegally overheard conversation would constitute a "hostile work environment" based on the given standards under *R.R. Passenger Corp., id.* In fact, Plaintiff would argue that one incident should have warranted Defendants coming to the Plaintiff, who was their direct supervisor at the time, and discussing their concerns prior to taking the outrageous actions that followed.

On page 16, paragraph 2, Defendants state, "In fact, advising the ProRodeo HOF whether to terminate McCormack for his myriad of financial failures was not only within the scope of Hitchcock's agency, it is one of the very core purposes of his agency." There is nothing in the Complaint that alleges that the financial problems with the ProRodeo HOF were caused as a result of Plaintiff's "myriad of financial failures." In fact, Plaintiff, in drafting his complaint, indicates only that he tries in vain to explain the actual causes for the financial situation and tries to offer solutions that are disregarded by Hitchcock and others. Information offered by Defendants in this regard is again outside the pleading and Defendants are obviously relying on extrinsic opinions of some of the Defendants or of third parties to state the reasons for their motion to dismiss. At a minimum, they are reading a great deal more into the Complaint than is actually presented.

In stating all of the above allegations in their Rule 12(b)(6) motion, Defendants have alleged actions independent of the Complaint to establish reasons for Plaintiff's termination which Plaintiff would dispute in presenting his case to a Jury. In footnote 1, on page 3 of the Defendants' Motion to Dismiss, Defendants state, "As a matter of record, Defendants clearly dispute many of the facts detailed in Plaintiff's Complaint." Plaintiff's is not surprised in this

4

revelation. However, Plaintiff should be allowed to either prove his case in Court, or have it

disproved by the Defendants by presenting facts supporting their "dispute." Therefore, Plaintiff

should be allowed to present his corroborating testimony and other evidence in order to prove his

contentions in front of a jury, not in a response to a frivolous Rule 12(b)(6) motion.

Plaintiff wishes to point out to the Court some of the misstatements and inconsistencies in

Defendants' Motion to Dismiss:

1.  Defendants state on page 2, paragraph 2, "Here, the gravamen of Plaintiff's

    Complaint is that defendants purportedly used a handheld digital recorder to tape his

    office conversations." The "gravamen" of Plaintiff's Complaint, which is spelled out

    distinctly and completely in Complaint paragraphs 78 through 96, is that Defendants

    *"secretly"* concealed a digital recorder in his personal office and *"secretly"* recorded

    plaintiff's private conversations both in person and over the telephone, on at least

    three occasions, without Plaintiff's consent or knowledge, and in violation of both

    state and federal criminal laws. Complaint distinctly alleges Defendants then shared

    those illegally obtained recordings with others, again in violation of state and federal

    law. While Defendants offer excuses for this conduct in their Motion to Dismiss,

    Defendants reasoning and justification for committing these crimes should be a

    matter to be proven in the Courts since Plaintiff vehemently disagrees with

    Defendants causation theory as stated in this Motion to Dismiss.

2.  In the Motion to Dismiss, at 3, ¶¶2, Defendants incorrectly assert, "He (Plaintiff) was

    hired in 2005 as the Chief Operating Officer of the PRCA and the Executive Director

of the ProRodeo HOF." Plaintiff would point out that the Complaint fully defines the chronology and description of Plaintiff's job assignments and duties from Human Resources Director to Chief Operating Officer, to Executive Director of the ProRodeo HOF (Compl. ¶¶18, 19, and 31). Plaintiff did not officially serve as both Chief Operating Officer and Executive Director of the ProRodeo HOF simultaneously.

3. Defendants' description of the events described at 3, ¶ 4 of the Motion of Dismiss, states, "Attempting to correct his behavior, Plaintiff's supervisor subsequently confronted him about the things the supervisor heard him say in the recordings." While stating the state of mind of the supervisor prior to the discussion that ensues after *Plaintiff* confronts his supervisor for misappropriating his recording device (Compl. at ¶¶ 82-83) is offering facts not included in the Complaint. Plaintiff would argue that the reason for the supervisor's reaction to being caught with the recording device was one of being defensive over his outrageous conduct.

Defendants have relied on the above stated matters, which are obviously outside the pleading, in filing their Rule 12(b)(6) motion to dismiss Plaintiff's Complaint upon the Defendants' belief that the allegations of the Complaint fail to state a claim upon which relief can be granted. Thus, pursuant to Rule 12(b)(6) (assuming these matters are not excluded by the Court) the motion should be treated as one for summary judgment and disposed of as provided in Fed. R. Civ. P. 56. Rule 12(b) further provides that "All parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 56 permits the use of supporting Affidavits.

## II. PLAINTIFF'S RESPONSE TO DEFENDANT'S "STANDARD FOR A MOTION TO DISMISS"

Defendants attempt to convince the Court that the Plaintiff's claim should be dismissed because the Complaint is based on "conclusory allegation or legal conclusions masquerading as factual conclusion." *Fernandez-Monrtes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

Defendant also cites a de novo ruling by the U.S. Supreme Court regarding the sufficiency standard under Rule 12(b)(6) of the Federal Rules of Civil Procedure that states, "once a claim has been stated adequately, it may be supported by <u>any set of facts</u> consistent with allegations in the Complaint." *Bell Atlantic Corp. v. Twombly*, _U.S._, 127 S.Ct. 1955, 1968-69 (May 21, 2007).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley* v. *Gibson,* 355 U. S. 41, 47 (1957). While the standard of pleading requirements necessary to state a claim under Rule 12(b)(6) are stated differently under *Bell Atlantic Corp. v. Twombly* than under *Conley v. Gibson,* since the language in the former that replaces the "any set of facts" standard for the "can prove no set of facts" standard in the latter, the Court still ruled that "...a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan* v. *American Bd. of Psychiatry and Neurology, Inc.,* 40 F. 3d 247, 251 (CA7 1994)," This is the additional language which actually precedes the case quotation Defendants cite on page 4, ¶¶ 3, which states, "[plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief] requires

more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do" see *Papasan* v. *Allain*, 478 U. S. 265, 286 (1986). Therefore, contrary to the Defendants' contention that the standard of review as announced in *Conley v. Gibson* has been "retired" by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, the standard remains the same. The Supreme Court, in *Twombly*, simply clarified that the Court should not read *Conley's* "no set of facts" standard so as to permit a wholly conclusory statement to survive a Motion to Dismiss. In the current case, however, the essential facts are clearly set forth in Plaintiff's Complaint.

Additional language in *Bell Atlantic*, 127 S.Ct. at 1965 on which that Court relied, and on which Plaintiff in this case relies on for relief, stated "Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure §1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than. . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, *e.g.*, *Swierkiewicz* v. *Sorema N. A.*, 534 U. S. 506, 508, n. 1 (2002); *Neitzke* v. *Williams*, 490 U. S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance. . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer* v. *Rhodes*, 416 U. S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). Furthermore, "See *Sanjuan*, 40 F. 3d, at 251 (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz*, 534 U. S., at 514; *National*

*Organization for Women, Inc.* v. *Scheidler,* 510 U. S. 249, 256 (1994); *H. J. Inc.* v. *Northwestern Bell Telephone Co.,* 492 U. S. 229, 249-250 (1989); *Hishon* v. *King & Spalding,* 467 U. S. 69, 73 (1984)." "*Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Additionally, in the *Bell Atlantic Corp v. Twombly* case, the dissent cited the following: ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. *Scheuer* v. *Rhodes,* 416 U. S. 232, 236 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

In presenting his Complaint in this matter, Plaintiff believes that the Court will find the pleadings in this case clearly spell out a factual basis for all of the claims alleged in the Complaint without relying on "conclusory allegations or legal conclusions masquerading as factual conclusion." Plaintiff has provided adequate facts that are consistent with the allegations in the Complaint to state a claim for all causes of action alleged and these facts are more than sufficient to place the Defendants on notice of the nature and content of Plaintiff's claim. Plaintiff has also satisfied the third condition set forth in Rule 8 by making a claim for damages.

Furthermore, in Defendant's Motion to Dismiss, it appears it would have served the Defendants more appropriately had they filed a Motion for More Definite Statement Under Rule 12(e) of the Federal Rule of Civil Procedure instead of a Motion for Dismissal under Rule 12(b)(6) since much of their motion seems to focus on attempts to ferret out information that should be reserved for the discovery process.

Even in cases involving claims of invasion of privacy, which necessarily involve free speech rights, rule 12(b)(6) Motions are disfavored and are rarely granted. *Meyers v. Guardian Life Insurance Company of America, Inc.,* 5 F. Supp.2d 423, 427 (N.D. Miss. 1998). See, also, *American Guaranty and Liability Insurance Company v. 1906 Company, 273 F.3d 605, 615 (5th Cir. 2001).*

Additional cases that help to `bolster Plaintiff's Response state the following: The purpose of Rule 12(b)(6) motions is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir.1994). In ruling on a motion to dismiss, a court "must construe the complaint in favor of the complaining party," *Utah v. Babbitt,* 137 F.3d 1193, 1204 (10th Cir.1998), "generally accept a plaintiff's well-pleaded allegations as true, and construe all reasonable inferences in favor of the plaintiff." *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976).

### III. PLAINTIFF'S RESPONSE TO DEFENDANTS' ARGUMENT REGARDING FAILURE TO STATE A CLAIM FOR VIOLATION OF THE FEDERAL WIRETAPPING STATUTE (COUNT I).

Defendants have presented to the Court an argument that Plaintiff's Complaint fails to state a claim for violation of the Electronic Communications Privacy Act (ECPA). "ECPA was divided into Title I, commonly known as the Wiretap Act, 18 U.S.C. §§ 2510-2522, and Title II, commonly known as the Stored Communications Act, 18 U.S.C. §§ 2701-2711. The amendments provided for the protection of electronic communications along with oral and wire communications." See S. Rep. No. 99-541, at 11 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3565.

To clarify facts the Defendants offer on page 5, ¶¶ 3 of the Motion to Dismiss, the Electronic Communications Privacy Act of 1986 (ECPA Pub. L. 99-508, Oct. 21, 1986, 100 Stat. 1848, 18 U.S.C. § 2510) was enacted by the United States Congress to extend government restrictions on wire taps from telephone calls to include transmissions of electronic data by computer. Specifically, ECPA was an amendment to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the Wire Tap Statute), which was primarily designed to prevent unauthorized government access to private electronic communications. The Electronic Communications Privacy Act (ECPA) was passed in 1986 to update the law to cover electronic communications. Before the ECPA was passed, the Wiretap Act protected only wire and oral communications from interception. ECPA extended the law to protect electronic communications for interception as well. ECPA also created the Stored Communications Act,

11

which established legal standards for access to electronic communications in the possession of a service provider. The changes created two distinct categories of electronic communications -- those "in transit," which enjoy relatively generous protection under the Wiretap Act, and those 'in storage,' which receive a lesser degree of legal protection under the Stored Communications Act. The two categories that resulted from the amendments were viewed as complimentary efforts to protect the privacy of electronic communications. The 'tiering' of communications resulted more from the effort to address specific concerns -- such as extending protections to electronic communications and creating safeguards for stored communications -- than to formally categorize the privacy protection for each type of information" see *U.S. v. Councilman,* 373 F. 3d 197 (1st Cir., 2004).

Furthermore, Defendants state, (Mot. Dism. at 6 ¶¶ 2) "the Federal Wiretapping Statute was intended to regulate 'wiretapping and electronic surveillance' in the face of increasing threats to privacy given the 'tremendous scientific and technological developments' in surveillance techniques." The Omnibus Crime Control and Safe Streets Act of 1968 (Pub.L. 90-351, June 19, 1968, 82 Stat. 197, 42 U.S.C. § 3711) was legislation passed by Congress that established the Law Enforcement Assistance Administration (LEAA). Title III of the Act set rules for obtaining wiretap orders in the United States. In Defendants' argument regarding the "wire tapping" issue, they are providing language relevant to this Act which was enacted in 1968. Plaintiff does not believe that the "tremendous scientific and technological developments in surveillance techniques" that had taken place by 1968 have not been far surpassed by the

12

developments of 2006 when the acts stated in this Complaint are alleged to have taken place.

Congress passed the 1968 Wiretap Act to "protect[] the privacy of wire and oral

communications, and [to] delineat[e] on a uniform basis the circumstances and conditions under

which the interception of wire and oral communications may be authorized." *Gelbard v. United*

*States,* 408 U.S. 41, 48 (1972) (quoting S. Rep. No. 90-1097, at 66 (1968), reprinted in 1968

U.S.C.C.A.N. 2153, 2153). By the mid-1980s, however, technology had outpaced the privacy

protections in the Act, creating uncertainty and gaps in its coverage. As one member of the

House Judiciary Committee lamented:

> [I]n the almost 20 years since Congress last addressed the issue of privacy of
> communications in a comprehensive fashion, the technologies of communication and
> interception have changed dramatically. Today we have large-scale electronic mail
> operations . . .and a dazzling array of digitized information networks which were little
> more than concepts two decades ago. These new modes of communication have
> outstripped the legal protection provided under statutory definitions bound by old
> technologies.

Electronic Communications Privacy Act: Hearings on H.R. 3378 Before the Subcomm.

on Courts, Civil Liberties, and the Adminstration of Justice of the House Comm. on the

Judiciary, 99th Cong. 1 (1985 1986) (statement of Chairman Kastenmeier); See also id. at 3

("[T]he American people and American businesses are no longer assured that the law protects

their right to communicate privately.") (Statement of Sen. Leahy). Congress passed the ECPA to

remedy these perceived weaknesses and to update and expand the privacy protections in the 1968

Act. See Sen. Rep. No. 99-541, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3555 ("The

bill amends the 1968 law to update and clarify Federal privacy protections and standards in light

of dramatic changes in new computer and telecommunications technologies."). In the current

case, another two decades had passed since Congress enacted the ECPA. With the passing of those decades, Plaintiff believes it is safe to conclude that electronic technology has progressed exponentially.

Defendants cite *United States v. Carroll,* 337 F, Supp. 1260 (D.C. Dist. 1971) and *United States v. Carroll,* 332 F. Supp. 1299, 1301 (D.C. Dist. 1971) to present their argument in support of dismissing the present case. Both of these cases were decided in 1971, fifteen years before the ECPA was enacted, therefore, the case was decided based upon the use of antiquated equipment and techniques in a vastly different time in our nations past. Plaintiff would argue that in the aftermath of the events that took place on September 11, 2001, and the enactment, utilization, and abuses of the U.S.A. Patriot Act of 2001, issues of privacy and interception of private communications within our courts are in a state of flux at best. "The Wiretap Act and Stored Communications Act were amended again by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act), Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001)."

Having been employed in the criminal justice system for over thirty years in one capacity or another, Plaintiff has first hand knowledge of the advancement in audio recording techniques and equipment since *Carroll* was decided in 1971. First, the size of "standard tape recorders" has diminished significantly over the years. The tape recorders available in 1971 are dwarfed by the tiny device that was secreted in Plaintiff's office in order to record his private conversations.

Furthermore, regarding the use of an "unaugmented recorder," as Defendants claim was

14

used in this case, with today's highly sophisticated techniques in audio enhancement, any tape or digital recording can be easily "augmented," or to use the proper terminology, "enhanced," by anyone with a computer and a modicum of knowledge. It is relatively easy today to provide clear and detailed information that could not normally be perceived by the naked ear or by the non-enhanced recording itself. Plaintiff has conducted many investigations using these techniques and fully intends to present experts in the field of audio enhancement to argue his case before the Court.

In a case prior to *Carroll,* supra, see *Katz v. United States,* 389 U.S. 347 (1967), FBI agents had attached an electronic listening and recording device to the outside of the public telephone booth from which Katz had placed his calls. One of the questions Katz posed to the Court was whether a public telephone booth is a constitutionally protected area so that evidence obtained by attaching an electronic listening recording device to the top of such a booth is obtained in violation of the right to privacy of the user of the booth. In its decision, the Court voiced the opinion that "The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a *business office,* in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it,

15

shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." In the instant case, Plaintiff was in his private *business office*, speaking on a land-line telephone, and in person, with other parties who did not consent to their conversation being surreptitiously tape recorded. Plaintiff conversed with these parties expecting that, with the level of his voice, Plaintiff's conversations would be private and not "broadcast to the world."

See also *Forsyth v. Barr*, 19 F. 3d 1527, 1543 (5th Cir. 1994) ("[The Act] authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions.... Unauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions are crimes, ... and the victim of such interception, disclosure, or use is entitled to recover civil damages...."). The court in *Forsyth* further stated, "we are aware from our court's past experiences, as reflected in part in note 25, supra, that construction of the Wiretap Act is fraught with trip wires. See, e.g., Briggs v. American Air Filter Co., Inc., 630 F.2d 414 (5th Cir.1980); Fleming v. United States, 547 F.2d at 873 ("Our analysis of ... [Secs. 2515 and 2517] makes us confident of only one conclusion: the statute is not a model of clarity"); Simpson v. Simpson, 490 F.2d 803 (5th Cir.), cert. denied, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). As hereinafter reflected, construction of Sec. 2517(1) and (2) is no exception; we balance on a high wire. The one clear, and most helpful, signal is the legislative history, quoted later.

("[A]lthough [the Act] authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern". Id. at 48, 92 S.Ct. at 2361); and, "("the limitations Congress placed on the willful disclosure of wire communications in subsection 2511(1)(c) should not be examined in a vacuum. As the Supreme Court has emphasized, a 'deeply rooted social obligation' exists for citizens to report felonies to the authorities"). As a final note in *Forsyth*, the court stated, "Although a defendant may be presumed to know the law, ... to establish use and disclosure liability under [the Act], a defendant must be shown to have been aware of the factual circumstances that would violate the statute. For example, it is not enough to show that a defendant merely knew he was using or disclosing information from an intercepted communication. It must also be shown that the defendant knew, inter alia, that neither party to the intercepted conversation had consented to the interception." Since none of the Defendants who participated in the unlawful surreptitious recordings of Plaintiff's private conversations obtained permission from any of the parties they recorded, and since they did not inform any of the parties of the secret recordings, Plaintiff believes it is safe to say that Defendants were "aware of the factual circumstances that would violate the statute." Furthermore, had Plaintiff not been ordered *not* to report these matters, which are felonies under both Colorado and Federal law, by his supervisor and members of the ProRodeo Hall of Fame trustees, many of these matters may have already been resolved in the State and Federal criminal courts.

17

In a more recent case regarding interception of private communications, *Doe v. Smith*, 429 F. 3d 706 (Fed. 7th Cir., 2005), Plaintiff Jane Doe (not her real name) was secretly video taped by Jason Smith while having sex with him in his bedroom. Smith had set up a hidden video camera in the room. On appeal to the 7th Circuit Court of Appeals, after the District Court dismissed her complaint under Rule Fed. R.Civ.P. 12(b)(6) as defective "because it does not allege in so many words that the recording was an interception within the meaning of § 2510(4)," the Circuit Court reversed in part on the following issues:

"The prohibitions bearing on Doe's allegations are in § 2511(1):"

"(1) Except as otherwise specifically provided in this chapter any person who —

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;..... (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;... shall be subject to suit as provided in subsection (5)."

"The first question is whether Doe could show, without contradicting any of the complaint's allegations, that Smith captured a "wire, oral, or electronic communication". The answer is yes. Doe may be able to establish that the recording had a sound track and that she had an expectation of privacy, the two ingredients of the statutory definition: "'oral communication' means any oral

18

communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication". 18 U.S.C. § 2510(2). A silent film would be outside this definition, but most video recorders capture sound as well."

"Next comes the question whether Smith "intercepted" the oral communication. This defined term "means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). If Doe and Smith engaged in "oral communication" in Smith's bedroom, then its acquisition by a video recorder — an "electronic ... device" — is covered. And if the interception was forbidden by § 2511(1)(a), then its disclosure was forbidden by § 2511(1)(c)." In the present Complaint, the device was also an "electronic device" a miniature digital tape recorder, and as such, should be covered under the statute.

Plaintiff could cite other cases in *support* of his pleading regarding wiretap/eavesdropping matters, however, the rulings and issues in this regard have been constantly changing for over forty years, and continue to change based on the given circumstances of each case. Plaintiff respectfully asks that the Court allow the issues in this case to be heard by a Jury in the federal courts and that the Jury be allowed to decide the merits of the case based upon all supporting facts and testimony.

Furthermore, Defendants did not refer to the eavesdropping issue involving Defendant Tanna Kimble (Compl. ¶¶ 109-114) in which Kimble was observed listening at Plaintiff's door

19

when she was informed he was involved in a private telephone conversation. Plaintiff believes

these actions constitute prima facie evidence of violation of Title 18, § 2511, which states, "1)

Except as otherwise specifically provided in this chapter any person who—(a) intentionally

intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to

intercept, any wire, *oral*, or electronic communication." This action alone should establish the

requisite claim to establish federal subject matter jurisdiction."

## IV. PLAINTIFF'S RESPONSE TO DEFENDANTS' ARGUMENT REGARDING COURT'S DIVESTITURE OF SUPPLEMENTAL SUBJECT MATTER JURISDICTION

Plaintiff concurs with Defendant in most of their assessment of this matter and, if the

Court divests itself of supplemental subject matter jurisdiction, without prejudice, Plaintiff will

seek further remedies in the Colorado State Court(s). Plaintiff does, however, take exception to

Defendants' claim that "Dismissal is particularly appropriate here given the numerous contract

and tort state-claims predominate the lawsuit and most are entirely separate and factually distinct

from the wiretapping claim." Plaintiff would argue that many of the supplemental jurisdictional

claims are directly tied to the wire tap issue, and that the wire tapping is what led to the break

down of communication between Plaintiff and Defendants, and that, subsequent to the wire tap

incidents, Defendants' actions were completely retaliatory. Plaintiff believes he has available the

requisite documentation and testimony to show and prove this correlation to a Trier of fact.

## V. PLAINTIFF'S RESPONSE TO DEFENDANTS' ARGUMENT REGARDING FAILURE TO STATE A CLAIM FOR BREACH OF CONTRACT (COUNT II OF COMPLAINT)

Defendant argues that "The law in Colorado is clear that, absent an explicit understanding to the contrary, every employment relationship is *presumed* to be "at will…" See *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992)(Mot. Dism. at 8, ¶¶ 3). The operative word in this citation is "presumed." Plaintiff would argue that this is a rebuttable presumption, or, "A species of legal presumption which holds good until evidence contrary to it is produced." See "*Beck v. Kansas City Public Service Co.*, Mo.App., 48 S.W.2d 213 215. In the case before this Court, Plaintiff is of the belief that he has ample evidence to present to the Court that will show the requisite rebuttal evidence to prove that his employment was not "at-will" at the time of his discharge. Many of these factors are spelled out in the Complaint itself; however, many attendant circumstances will come into play during the discovery process and during pre-trial and trial matters to prove Plaintiff's allegations.

As Plaintiff has already pointed out in his argument regarding Defendant's "Standard for a Motion to Dismiss," supra, the facts in support of a Complaint are not required to contain all of the information the Plaintiff's intends to present to a Jury, it must provide the facts required under Rule 8(a)(2) that being only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley* v. *Gibson,* supra. Throughout Defendants' Motion to Dismiss, the common thread is a demand for more information. Plaintiff argues that it is not necessary to *prove* his case through the Complaint, lest he may inadvertently "plead himself out of court by alleging facts that defeat recovery." See, e.g., *Walker v. Thompson,* 288 F.3d 1005

21

(7th Cir.2002). There are some facts Defendants may be required to prove in order to prevail. Plaintiff is not required to furnish all of those details during the pleading stage. Those details are preserved for subsequent legal maneuvers by the Defendants during the formal and informal discovery process and through testimony presented during trial.

In order to present their argument in their Motion to Dismiss regarding at-will employment, Defendants rely on language stated in *Martin Marietta Corp v. Lorenz,* supra. However, Defendant chose to omit the key facts in the Court's ruling in the paragraph they cited, which states in full, "A basic common-law doctrine was that, in the absence of an explicit contract to the contrary, every employment is presumed to be an "at-will" employment. See C. Summers, Individual Protection Against Unjust Dismissal: Time for a Statute, 62 Va.L.Rev. 481, 484 (1976). Reinforcing this basic rule was a special rule of mutuality of obligation, pursuant to which either the employer or the employee was free to terminate the employment at any time for no cause whatever and without notice. Id. at 484-85. The at-will employment doctrine thus evolved to the point where both employer and employee could terminate the employment relationship without thereby being subjected to legal liability for the termination. Cloutier v. Great Atlantic & Pac. Tea Co., Inc., 121 N.H. 915, 436 A.2d 1140, 1142 (1981). In the latter part of this century, however, courts have come to recognize that the at-will employment doctrine implicates not only an employer's discretion in hiring and firing but also the important interest of the employee in holding on to a job and society's interest in fixing a proper balance between the two. Id. 436 A.2d at 1143."

22

Defendants then proceeds to argue that the July 5, 2006 letter presented to Plaintiff by Troy Ellerman (Mot. Dism. at 8, ¶¶ 3) does not "constitute a written contract with the PRCA which the PRCA breached by 'terminating [his] employment prior to January 2007.'" Plaintiff is not alleging a contract with the "PRCA" since Plaintiff was not employed by the PRCA at the time of this incident. Plaintiff was, at the time, Executive Director of the ProRodeo HOF, a separate entity. Furthermore, Plaintiff alleges his contractual advantage with that organization based upon the "Ellerman letter," supra, along with several other attendant circumstances surrounding the formation and implementation of matters contained in the letter, was breached by Defendants. Plaintiff argues that information in the Complaint is sufficient to state a claim and his supporting information (supra) should be saved for discovery, and is not required to state a cause of action in the initial pleadings.

Defendant then lays out a list of elements Plaintiff must allege in the complaint in order to state a claim for breach of contract (Mot. Dism. at 9, ¶¶ 2). Addressing Item 1, Plaintiff believes he stated a clear allegation of the existence of a contract by referring to the July 5, letter and its implications (Compl. ¶¶ 102-106). Defendant Ellerman made an offer of continued employment with a compulsory condition that as long as "things are going well," plaintiff would remain employed. Plaintiff accepted the terms of the offer by signing the contract. Plaintiff began performing the contract under its terms as indicated in Complaint ¶¶107, and Defendants breached the contract by terminating Plaintiff's employment making it impossible for Plaintiff to complete his obligations under the terms of the contract. Furthermore, as to Item 2,  Plaintiff

23

believes that it is incumbent upon the Defendants to show that Plaintiff did not perform to the terms, or conversely breached the contract, however, if the Court requires a better statement, the Plaintiff has the necessary documentation to accommodate the Court's request. Regarding Item 3, the Complaint clearly alleges that Defendants failed to perform under the terms of the contract by terminating Plaintiff's employment prior to the agreed upon date of January, 2007. Finally, in Item 4, damages were incurred by loss of income and other pecuniary consequences involved with Plaintiff's job termination, not mention emotional suffering, damage to reputation, etc.

Defendants then cites elements necessary to form an enforceable contract (Mot. Dism. at 9, ¶¶ 4). Defendants do not discuss in this analysis the other forms of consideration the Plaintiff may rely on for recovery, such as promissory estoppel ("That which arises when there is a promise which promisor should reasonably expect to induce action or forbearance of a definite and substantial character on part of promisee, and which does induce such action or forbearance, and such promise is binding if injustice can be avoided only by enforcement of promise. "Moore" Burger, Inc. v. Phillips Petroleum Co., Tex., 492 S.W.2d 934.") or duty of good faith and fair dealings. As to the latter, Defendants state in their Motion to Dismiss at 3, ¶¶ 1, that "the implied covenant of good faith and fair dealing in the employment context is not cognizable in Colorado." and Mot. Dism. at 17, ¶¶ 3-4, "there is no such cognizable claim in the employment context" and "Colorado does not recognize an implied covenant of good faith a fair dealing in employment contracts." Defendants cite *Pittman v. Larson Distributing Co.*, 724 P.2d 1379, 1387 (Colo. Ct. App. 1986) as the source they rely on to state their case. The Court, in deciding

24

*Pittman*, stated, "In support of his position, Pittman cites *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977) which presents very different factual circumstances. The Court denied Pittman motion regarding an implied covenant of good faith and fair dealing because the facts presented in *Pittman* did not meet the standard that *Fortune*, id. did in presenting its case to the Massachusetts court. In *Fortune, id*, the Court ruled, "We hold that NCR's written contract contains an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of the contract.'" Pittman contends that the trial court erred in ruling that his employment contract with the company was terminable at will. He argues that his evidence made a prima facie case of permanent employment for jury consideration. We agree.  It is ordinarily for the jury to ascertain the meaning of 'permanent' used in an oral employment contract in the light of all the circumstances surrounding the making of the agreement. Lucacher v. Kerson, 355 Pa. 79, 48 A.2d 857 (1946). Nevertheless, in the absence of special consideration or an express stipulation as to the duration of employment, a contract for permanent employment is no more than an indefinite general hiring terminable at the will of either party. Lampe v. Presbyterian Medical Center, 41 Colo.App. 465, 590 P.2d 513 (1978); Justice v. Stanley Aviation Corp., 35 Colo.App. 1, 530 P.2d 984 (1974). Special consideration includes, among other circumstances, the acceptance by the employee of lower pay, and the employer's acquisition of the expertise and customer contacts of an experienced salesman. Beeler v. H & R Block of Colorado, Inc., 487 P.2d 569 (Colo.App.1971) (not selected for official publication) (lower pay); Fletcher v. Agar Mfg. Corp., 45 F.Supp. 650

(W.D.Mo.1942) (experience and customer contacts). See also Annot., 60 A.L.R.3d 226 at 264 (1974); 56 C.J.S. Master & Servant § 8."

In *Pittman, supra*, Pittman testified that his oral contract was for "permanent" employment, that he took an initial cut in pay when he began work for the company, and that he brought to the company substantial customer contacts and experience. These circumstances could have been found by the jury to represent special consideration so that the employment was not terminable at will. In the present case, Plaintiff also took and initial cut in pay, and when hired brought management skills to the organization that substantially improved employee morale and productivity and saved the PRCA a great deal of money through restructuring of departments and personnel cuts. Plaintiff would argue that this also created "special consideration." While this may be an argument Defendants would now dispute, Plaintiff should be allowed to present supporting testimony and documents to a Jury in order for them to decide.

Additionally, in *Pittman, supra*, the Court states "Apparently influenced by Thacker v. American Foundry, 78 Cal.App.2d 76, 177 P.2d 322 (1947), the trial court ruled that Pittman was required to prove that he had been "importuned, induced, or in any way persuaded" to leave his former employment and that he failed to do so. Without addressing the applicability of such a rule, we note that, if such a showing were required, there is ample evidence in the record to demonstrate inducement. Hence, there was sufficient evidence to show that the contract was not terminable at will and the issue should have been submitted to the jury."

In the instant case, Defendants fail to acknowledge or deny the contractual theories presented by Plaintiff in the Complaint, namely, the inducement by Defendant Ellerman, detrimental reliance by Plaintiff, and breech by Defendants in accepting and relying on the employment offer in February, 2005 (Compl. ¶¶ 11-31).

Defendants may argue that the new terms created by the acceptance to work as Executive Director of the ProRodeo HOF may somehow negate the initial employment contract and turn it to an at-will employment situation. However, "a contract for employment terminable at the will of either party may be supplanted by new terms of employment accepted by acquiescence. Linder v. Midland Oil Refining Co., 96 Colo. 160, 40 P.2d 253 (1935).

Part of the ruling in *Brezinski v. F.W. Woolworth*, 626 F.Supp. 240 (Colo., 1986) states, "In *Rawson*, the plaintiff merely alleged that "[t]he acts of the [d]efendant ... constitute a breach of contract." No facts or other allegations appeared in the complaint to support this claim. I dismissed the plaintiff's breach of contract claim because the plaintiff's bare allegation that the defendant's acts constituted a breach of contract did not comply with Fed.R.Civ.P. 8(a)(2). *Rawson*, 530 F.Supp. 776, 781. Specifically, the plaintiff did not plead any of the elements of a contract and, thus, this claim did not give fair notice to the defendant. *Id.* By contrast, in the present case, the complaint alleges that defendant expressly agreed, during the period of plaintiff's employment, that plaintiff would be discharged only for cause. Plaintiff also alleges in his complaint that there was an implied agreement that he would be discharged only for just grounds and in good faith. Construing these allegations in the light most favorable to plaintiff, I

find that they are sufficient under Rule 8(a)(2). Defendant has been placed on notice as to the existence of both an express and an implied contract in this case. Thus, plaintiff's claims do not suffer from the same defects as in *Rawson.*"

Plaintiff would argue that the facts in *Brezinski,* parallel facts in this case, namely the promises made by Defendant Ellerman regarding continued promises of employment (Compl. ¶¶ 14-31).

In response to Defendants' contention that Colorado Courts do not recognize the duty of good faith and fair dealing theory in employment law, Plaintiff would argue that the cases cited by the Defendants (Mot. Dism. at 17 ¶¶ 4, and 18 ¶¶ 1), regarding the Colorado courts not recognizing the implied covenant of good faith and fair dealing, all refer to "at-will" employment contracts and contexts. Plaintiff in this case is alleging the existence of oral and written employment contracts, not merely at-will employment. The "Artful pleading" described by Defendants in their Motion to Dismiss, is confined to the specific facts in the *Donohue v. Unipac Serv. Corp.,* 847 F. Supp. 1530, 1535 (D. Colo. 1994), and should not be attached to the pleadings in the instant case. Whether an enforceable contract existed in the case currently before the Court is a matter a Jury should decide.

In *Price v. Federal Exp. Corp.,* 660 F.Supp. 1388 (Colo., 1987) the court stated the following: "*Express good-faith and fair dealing.* Even if the alleged facts of the instant case were

28

not enough to justify the invocation of the implied covenant of good faith, they certainly support a more straightforward claim based on express representations of fair treatment. Enforcement of plaintiff's reasonable expectations of fair treatment, based on an employer's representations, is analogous to judicial enforcement of representations made in employment handbooks or manuals concerning procedures to be followed in discharge decisions. *Brooks v. Trans World Airlines*, 574 F.Supp. 805 (D.Colo. 1983); *Salimi v. Farmers Insurance Group*, 684 P.2d 264 (Colo.App.1984); *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo.1987).

In *Brooks, supra,* the plaintiff was a furloughed employee who was suing based on his employer's alleged age discrimination and breach of contract. The defendant in that case argued, as does defendant in the instant case, that under Colorado law, a discharged employee has no recourse against his or her employer in the absence of a fixed term contract. Although I recognized this general rule in *Brooks,* I also recognized the exception to this rule when certain policies and provisions are set forth in an employee manual upon which employees reasonably rely.[3] In *Brooks,* I stated: In the past 50 years ... courts have shown an increased willingness to step between employer and employee. They have typically either recognized actions for wrongful discharge in violation of public policy, [citation omitted], a covenant of good faith in an employment contract, [citation omitted], or found an implied contract in a personnel manual or an employer's specific policies. [citation omitted].

The Colorado Supreme Court has held that "[t]he duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the

29

contract . . . [and t]he covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995). Discharge of the employee may be considered such a discretionary decision, affecting a party's reasonable expectations under the contract. As *Amoco* recognizes: "The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations." *Id.*

"Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing." § 4-1-203, 2 C.R.S. (1992) ("Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."); see, e.g., Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc., 872 P.2d 1359, 1362 (Co.App.1994); Friedman v. Colorado Nat'l Bank, 825 P.2d 1033, 1042 (Colo.App.1991), rev'd on other grounds, 846 P.2d 159 (Colo.1993); Ruff v. Yuma County Transp Co., 690 P.2d 1296, 1298 (Colo.App.1984); Larese v. Creamland Dairies, Inc., 767 F.2d 716, 717 (10th Cir.1985) (explaining that the franchisor-franchisee relationship is one that requires the parties to deal with one another in good faith and in a commercially reasonable manner); see generally Restatement (Second) of Contracts § 205 (1981); 3 Arthur Linton Corbin, Corbin on Contracts § 561, at 278 n. 2 (1960); Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv.L.Rev. 369, 369 (1980) [hereinafter Burton I].

Finally, Defendants question Plaintiff's "full performance" and PRCA's non-performance" in the employment contract. Defendants alleges Plaintiff has failed to present these

facts in the Complaint. Plaintiff would argue that the Complaint fully explains these issues

completely. The facts presented in the Complaint show that Plaintiff was "taking steps necessary

to comply with all the directives in the letter" presented to him on August 14, 2006 by the HOF

board of trustees (Compl. ¶¶ 118).  Furthermore, Plaintiff cites ¶¶ 107 of the Complaint which

shows Plaintiff was attending "weekly meetings as set out in Dr. Tucker's plan." Whether

Plaintiff breached the contract is a matter Plaintiff believes should be determined by a Jury.

However, as an affirmative defense to breaching the contract, Plaintiff has presented in the

Complaint the defense of impossibility of performance (Compl. ¶¶ 127) due to the fact that the

"board of the HOF met, and voted to terminate McCormack's employment with the HOF. Under

theses circumstances, it was impossible for Plaintiff to not breach the terms of the employment

contract. "Impossibility of performance is determined by whether "an unanticipated circumstance

has made performance of the promise vitally different from what should reasonably have been

within the contemplation of both parties when they entered into the contract." Littleton v.

Employers Fire Insurance Co., 169 Colo. 104, 453 P.2d 810 (1969); Town of Fraser v. Davis,

644 P.2d 100 (Colo.App.1982).  Under the contract discussed in the Complaint in reference to

the July 5, 2006 letter, Plaintiff was only allowed 56 days to comply with the terms of the

contract. Under the August 14, 2006 letter, Plaintiff was only given 16 days to comply.

   Based on the forgoing, Plaintiff states that he has properly pled all that is necessary for

the Court to rule that adequate information has been provided in the pleading to state a case for

breach of contract for which relief may be granted. Plaintiff also wishes to note that, based upon

many of the issues presented in the Defendants' Motion to Dismiss, he intends to follow this response with a Motion for Leave to Amend the Complaint, which will offer additional facts and causes of action to support Plaintiff's theory for recovery.

## VI. PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS BASED ON FAILURE TO STATE A CLAIM FOR CIVIL CONSPIRACY (COUNT IV).

In Defendants' Motion to Dismiss, Defendants assert that the facts provided in the Complaint to support a finding for Civil Conspiracy are "conclusory and vague." The standards to determine that elements presented in Sieverding v. Colorado Bar Ass'n, 2003 WL 22400218, *17 (D. Colo. 2003) were "conclusory" is "...because the plaintiffs claims are so nebulous ("conspiracy of abuse of process;" "conspiracy to deny and accessory to denial of federal and state constitutional rights;" "failure to properly supervise and restrict dangerous attorneys"), their summary does not allow the court to discern which of defendants' elaborately detailed actions are linked to the various claims. I emphasize that this is not a result of too little factual detail in the complaint. Rather, it is a result of including far too many facts in a disorganized complaint that apparently chronicles every disagreeable encounter that plaintiffs ever experienced while residents of Colorado." Furthermore, regarding Plaintiffs in Sieverding, id. their "...grievance grew and grew, to include anyone and everyone who were perceived by plaintiffs to be in agreement with the Bennetts — or, in plaintiffs' minds, "in conspiracy" with the Bennetts. The list of defendants grew to include the lawyers who represented the Bennetts, the public officials who failed or refused to act against the Bennetts, the judge who ruled in favor of the Bennetts, and so forth. The list has grown to where it now includes the lawyers who represent the people,

32

lawyers or entities against whom plaintiffs commenced their legal actions, and the defendants' insurance company. These are the facts presented in the case that led the Court to require that Plaintiffs in the case state the claims with "particularity."

In the present case, however,  Plaintiff provided a detailed set of facts in the Complaint (Compl. ¶¶ 79-96) which clearly shows that: (1) two or more persons (Kimble, Turner, Ellerman, and possibly as yet unidentified parties); had either (2) an unlawful objective or lawful objective to be accomplished through unlawful means (violation of ECPA as stated in the Complaint, for as yet to be determined reasons, as well as violation of Colorado Revised Statute (CRS) § 18-9-304, Eavesdropping); (3) a meeting of the minds on the object or course of action (Kimble's statement (Compl. ¶¶ 81) shows knowledge of tape recorder being give to Ellerman by Turner after obtaining private information, and content of secret recording provide supporting information (Compl. ¶¶ 86)); (4) one or more unlawful overt acts (secreting and activating recorder in Plaintiff's office and giving recorder with illegally recorded information to Ellerman); (5) damages as the proximate result thereof (creation of personal rift between Plaintiff and employer that eventually led to termination).

As to failure to allege when, where, how, and specific terms of the agreement of the conspiracy took place (Mot. Dism. at 13, ¶¶ 1), Plaintiff was not privy to those factors since he was not allow to pursue a full investigation under threat of being fired by his employer (Compl. ¶¶84-85). Plaintiff intends to gain these facts through discovery and testimony at trial.

As to the "actionable civil wrong or tort that can serve as the basis for the conspiracy" (Mot. Dism. at 13, ¶¶ 2), whether Plaintiff "has failed to state a claim under the Federal Wiretapping Statute" has yet to be decided by the Court.

### VII. PLAINTIFF'S RESPONSE TO FAILURE TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS (COUNT VI)

Plaintiff cites Graziani v. Epic Data Corp., 305 F.Supp. 2d 1192 (D. Colo. 2004) to establish the requisite elements necessary to state his claim for Tortious Interference with Economic Relations. The Court in Graziani, id, states, "This Court is exercising its diversity jurisdiction and the substantive law of Colorado therefore governs this dispute. *Blackhawk-Central City Sanitation Dist. v. Am. Guarantee,* 214 F.3d 1183, 1188 (10th Cir.2000). Colorado recognizes the tort of intentional interference with contractual relations. *American. Express Financial Advisors, Inc. v. Topel,* 38 F.Supp.2d 1233, 1241 (D.Colo.1999); *Colorado Nat'l Bank of Denver v. Friedman,* 846 P.2d 159, 170 (Colo.1993); *Memorial Gardens, Inc. v. Olympian Sales and Mgmt. Consultants, Inc.,* 690 P.2d 207, 210 (Colo.1984) (adopting Restatement (Second) of Torts §§ 766-768 which address intentional interference with a contract). To establish a prima facie case of intentional interference with contractual relations, the plaintiff must prove (1) the existence of a valid contract between the plaintiff and the third party; (2) knowledge by the defendant of a contract; (3) intentional action by the defendant that induced the breach of the contract and; (4) resulting damages. *Lutfi v. Brighton Cmty. Hosp. Ass'n,* 40 P.3d 51, 58 (Colo.App.2001); *Williams v. Burns,* 540 F.Supp. 1243, 1251 (D.Colo.1982).

34

As has already been established in this Response, supra, that Plaintiff is alleging the existence of a contract under three theories. Those theories include the verbal assurance of Defendant Ellerman (Compl. ¶¶ 14-27, the July 5, 2006 letter (Compl. ¶¶ 102-106, and the August 14, 2006 letter from the ProRodeo HOF trustees (Compl. ¶¶ 116-118). These allegations are clearly stated in the Complaint in spite of allegation by Defendants to the contrary. Defendant Hitchcock was aware of the contractual relationship regarding the August 14, 2006 letter because he was a member of the board of trustees, as well as the "special committee" who drafted the letter and forwarded it to Plaintiff. Defendant Hitchcock's calling a special meeting and demanding that the board of trustees of the ProRodeo HOF fire Plaintiff satisfies the intentional action by the defendant that induced the breach of the contract. Finally, Plaintiff has suffered damages due to loss of employment. All of these elements are fully spelled out in the Complaint at ¶¶ 155-160.

Defendants state in the Motion to Dismiss that Plaintiff has failed to demonstrate that Hitchcock's interference was improper or otherwise unlawful. Facts laid out in the Complaint at ¶¶ 115-132 show that Hitchcock willfully and wantonly took steps to terminate Plaintiff's employment immediately after he received a letter advising him that Plaintiff was attempting to replace Hitchcock on the "special committee" because the committee was formed illegally in violation of the HOF bylaws, and was, therefore, retaliatory.

Colorado recognizes the tort of intentional interference with a prospective business relation. Dolton v. Capitol Fed. Sav. & Loan Ass'n, 642 P.2d 21, 23 (Colo.App.1981). The Restatement (Second) of Torts § 766B (1979) provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or  (b) preventing the other from acquiring or continuing the prospective relation.

Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract. Dolton, 642 P.2d at 23. Comment c of section 766B notes:

"The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation." Restatement (Second) of Torts § 766B cmt. c (1979).

Under Colorado law, "even a contract terminable at will is entitled to some protection from tortious interference." Snoey v. Advanced Forming Technology, Inc., 844 F.Supp. 1394, 1400 (D.Colo.1994).

As to Hitchcock's immunity as an officer of the ProRodeo HOF, "An officer of a corporation generally will not be held personally liable for inducing the corporation's breach of [an at-will] contract with another if the officer is acting within the scope of his official duties. "However, if the officer or director is motivated solely by a desire to induce the corporation to breach its contract with the plaintiff or to interfere with the contractual relations between the corporation and the plaintiff, the interference is improper." *Meehan v. Amax Oil & Gas, Inc.*, 796 F.Supp. 461, 465 (D.Colo.1992) (quoting *Zappa v. Seiver,* 706 P.2d 440, 442 (Colo.App. 1985)). The defendant's motivation for inducing the breach is generally a question of fact for the jury. *Id.; see also Cronk v.Intermountain Rural Elec. Ass'n,* 765 P.2d 619, 623 (Colo.App.1988).

Plaintiff is of the belief that Defendant Ryer Hitchcock aggressively attacked and bullied Plaintiff for personal reasons outside the scope of his duties as a member of the ProRodeo HOF board of trustees. Plaintiff has additional information regarding specific ulterior motives for Hitchcock's actions toward Plaintiff, but must confirm them through the informal and formal discovery process. At this juncture, Plaintiff strongly believes the claims stated as to this cause of action are properly and adequately stated and should not be dismissed pursuant to Defendants' Rule 12(b)(6) motion.

## VII. PLAINTIFF'S RESPONSE TO DEFENDANTS' ARGUMENT THAT COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT VII).

Plaintiff has included his contentions regarding this matter in Item V, supra, and will, therefore restate it here. Plaintiff will argue that the Complaint does contain the necessary fact to

support a claim for which relief may be granted based upon the facts presented in Item V of this Response.

## VIII. CONCLUSION

WHEREFORE Plaintiff requests that Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) be denied in its entirety and awarding any further relief the Court deem proper and just.

Respectfully submitted this 27th day of September, 2007.


_____
Larry W. McCormack
Plaintiff in propria persona
6387 Mesedge Drive
Colorado Springs, CO 80919
(719) 302-6200
Facsimile (719) 302-2402
P_eye57@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 24, 2007, I served the foregoing

documents by placing true and correct copies in the U.S. Mail, first-class, postage prepaid,

addressed as follows:


Melvin B. Sabey, Esq.
KUTAK ROCK, LLP
1801 California Street, Suite 3100
Denver, CO 80202

Jenny Brook, Esq.
GREENBERG TRAUREG, LLP
The Tabor Center
1200 Seventeenth Street, Suite 2400
Denver, CO 80202


Larry W. McCormack